That brings us to the final case we will hear for argument this morning. U.S. v. Palma, Appeal No. 25-1045. And we welcome Mr. Leonard to the podium. Good morning. May it please the Court. Let's just make sure that we have Judge Rovner before you begin, Mr. Leonard. Judge Rovner, can you hear us? Now I can. All right. We were just about to have Mr. Leonard begin. I am so sorry, everyone. That's all right. It was really quite quick. Okay, Mr. Leonard. All I missed was you calling Mr. Leonard up. That's right. Good morning. May it please the Court. Mike Leonard on behalf of Giulio Palma. Mr. Palma is a gentleman who has had a distinguished career as a lawyer in Italy. Then he came to the United States and first worked at a large law firm and then worked for a company. And that's where he became intertwined with Mr. Koss, who was involved in the investments at issue. And what this case really involves is a group of very sophisticated investors who had large sums of money, who wanted a win-win for themselves. They wanted to eventually make money. But equally important, they understood that they would have losses for perhaps a significant or substantial period of time. And they wanted to, pursuant to Mr. Koss's pitches to them, accumulate losses so that they could get a K-1, which would allow them, according to Mr. Koss, to get a dollar-for-dollar tax reduction on their income taxes. And that's exactly what they were able to achieve. They got over a million dollars in K-1 losses for properties that they represented in the United States government K-1 they were the owners of. Contrary to the government's position in its papers in a trial, Mr. Koss admitted explicitly in government exhibit number 12 that one of the properties purchased was called Via Terme for $5.6 million. But the heart of this case relates to Mr. Palma's ability to receive compensation for his role. And that brings me to my question. Even under your theory of the case, that Mr. Palma wasn't entitled to his agreement upon payment, $2 million out of $6 million is certainly far more than 7.6%. That is correct. However, two things are important, Judge, there. Number one, the overall transaction contemplated as admitted by the unequivocal testimony of Mr. Koss was that the project as a whole, that they had to raise $20 to $30 million. That would entitle Mr. Palma to at least a 7.5% share or commission of the $20 to $30 million. And the key here is the foundation for the agreement. So, on the one hand, the government attempts to argue in their brief and tried to argue to the jury at trial that Mr. Koss was not entitled to a fee. Yet, on cross-examination, every single witness indicated, investor witness, Mr. Palma was entitled to a fee, and they knew that, including Mr. Shipp, Mr. Roberts, Mr. Koss himself, Ms. Boone, and Ms. Boone's husband. Amazingly, no investor witness asked any questions to Mr. Koss about when does he get the commission? Does he get the commission up to total transactional $20 to $30 million? Does he get it as we put it in? Does he get it when we acquire a property? So, they just operated in the dark, allowing Mr. Palma to take a fee, which they unequivocally admitted he was entitled to take, not knowing the amount of the fee, but then at the end of the day, complaining that the fee you took too much, which we asked no questions about, and didn't understand what the number was, was too high. And this is also supported not just by the admissions of each and every investor witness, but by the record evidence. Defendants number 17 was Mr. Koss. Is it your position that Mr. Palma never told any investor that he would not be paid until after the property was purchased? You state on page 19 of your brief that all of the investors, with the possible exception of Hallberg, knew that Palma either was being paid or would be paid. But there's a big difference between knowing he was being paid or would be paid in the future after performance. Well, Judge, two things there. The admissions of Shipp, Roberts, Koss, Boone, and Boone was that he was being paid. And in fact, the one transaction the government was able to point to in guarding Ms. Boone, which is the last $200,000 investment, they were sort of taking a position in a briefing at trial. That's sort of a gotcha moment, because Ms. Boone in asks Koss, is Palma being paid now, essentially? And he actually answers the question truthfully and directly. He is being paid outside the company, meaning he's being paid by KRO Investments. And Mr. Koss admitted that on cross-examination. But, Judge, it's impossible for these investors, based upon the record evidence, to say that they didn't know he was being paid when you had their admissions, but you also had, Judge, them receiving at the end of each year a statement that showed the financial condition of the company. And included in that was the actual balance in the bank of how much money was there. And Mr. Phillips, who was an independent accountant, testified that he disclosed to all of them that the money in the bank was approximately, I think, $120,000 or $130,000. No one raised an eyebrow, no one complained, no one asked questions, because they knew, pursuant to their admissions, he was being paid. There's no other explanation for that. In addition, Your Honor, there are two documents. Maybe they thought that the money was gone because the properties were being rehabilitated or bought or whatever. But that wasn't their testimony, Judge. And that's belied by the documentary evidence introduced by both the government and the defense, which showed, and again, it goes back to the 7.5 issue. If Mr. Palma really was only entitled to 7.5 of an acquisition after the close, it would make no sense that Kloss was submitting documents to all the investors saying Mr. Palma was entitled to $3 million in one. In another document, he was saying Mr. Palma is entitled to approximately $900,000. And further, Judge, Mr. Kloss, who is the government star witness, actually submitted an employment verification saying that Mr. Palma was being paid. So there's no basis for these conclusions that each and every one did not understand he was then being paid. The only way we get around that is if we assume, well, direct examination in a trial counts, but when witnesses make unequivocal admissions on Kloss, we can ignore them, which we can't. I'd also like to briefly address specifically counts 4, 5, and 7. There is nothing in the record with respect to those counts that showed Mr. Palma had anything whatsoever to do with those investments. He had not talked to those folks. He had not solicited them. He had not asked them for money. There's an inference that they may have known of his existence in counts 4, 5, and 7 when they made their investments. The fact that they knew Palma might have existed is certainly not enough to meet the government's burden that Mr. Palma made a material representation that a wire was foreseeable to be made in light of Mr. Palma's involvement. So those counts on their face, there's nothing there. Each and every investor with regard to those counts admits Palma had nothing to do with those investments unequivocally. And so the idea that a wire would result or be foreseeable from a guy that they might know the existence of is not sufficient. Does that account for the two investors who make, it might be more than two, but I at least remember two who make two separate investments at two different times? Correct. And where the evidence showed perhaps Palma was not on the scene for the first investment but perhaps for the second investment? Correct. I think you're referring to what would be the last Boone investment, which is count 3. And Hallberg, too. Yeah. Hallberg, I kind of put Hallbergs aside and look into traditional original investors. With regard to Hallberg, again, where that fails is the government went forward on the theory and evidence that that was a part of this fraudulent scheme that related to those original four or five investors, which is nonsensical. We know from the record that it was Mr. Cost that pitched him repeatedly for loans, received loans from Mr. Hallberg, and then finally the final deal with Hallberg was a monetary agreement pursuant to an operating agreement that Mr. Palma was not a part of. I'll reserve my last 40 seconds. Indeed. Thank you for that, Mr. Leonard. Mr. Young. May it please the court. The district court appropriately denied the defendant's motion for acquittal because the evidence, which must be viewed in the light most favorable to the government, was more than sufficient for a rational jury to conclude the defendant was guilty beyond a reasonable doubt. The evidence established that the defendant knowingly participated in a scheme to defraud that involved embezzling nearly $2 million in investor funds that were entrusted to him and solely to him for the purpose of purchasing these properties in Italy. And the evidence established that he did so with the requisite intent to defraud. Best reflected by the numerous, repeated, continuous false statements he made to investors from the very beginning to the very end claiming that he was not receiving any compensation all while he was using the money that had been entrusted to him to pay for the purchase of his personal residence in Chicago, to pay for trips to Hawaii and Disney Cruise, and to cover his daily expenses, grocery bills, restaurants, clothing, liquor stores, and health care. You know, one thing counsel didn't mention during his presentation was all the false statements the defendant made to these various investors. The numerous times he told them, I am working without pay. Each and every investor at some point in time, first of all, spoke with the defendant. Mr. Leonard's assertion that Mr. Shipp, the Boons, and Wilhelm Roberts never met with the defendant is categorically inconsistent with the record. Mr. Roberts testified that he went to Italy with the defendant. The Boons talked about a phone conversation with the defendant in January of 2008. Mr. Shipp talked about two phone conversations. He had contact with each and every investor. That was the testimony, and they all said the same thing, that it was their understanding their money would be used to acquire those properties. And they also said that they would not have entrusted their money to the defendant had they known that he was intending to take an upfront fee, basically a commission that he was skimming off the top of the investments. They also testified about his false statements. False statements he made to each and every investor at various times. In late 2018, James Hallberg talks about an in-person meeting with the defendant where the defendant and costs tell him, we will not be compensated. We will not receive any money until you get your full investment back. In fact, we will work, the defendant states he will work, you know, cover his expenses with other work that he's doing. Later the next year, 2000 . . . Would the misleading information given to Hallberg alone have been enough to support the full conviction? It certainly would, Your Honor. That alone would establish that there was a scheme to fraud, a scheme designed to obtain money and property from others. But it wasn't the only misstatement in this case, importantly. Now, he made statements to the Boone in January of 2018 during a call, a call that was conducted in order to discuss the progress, or actually more appropriately the lack of progress in these properties being acquired. During that call, the defendant tells the Boones, and possibly Mr. Shipp who may have been on that call as well, that he is not getting paid. In May of 2017, he has a telephone call with Wilhelm Roberts, and again, they're talking about the lack of progress, why none of these properties are being acquired. He represents that he's not getting paid. At the end of 2016, the defendant and costs forward an operating agreement to the Boones and to Mr. Shipp amongst many other e-mails representing that they, they being costs and the defendant, the managers of the project, have received no compensation to date. Importantly, with e-mails sent to the investors around that same time, costs and the defendant are representing that the payments to defendant will be a fee of 7.5%, but it will be on a per acquisition basis. In other words, he will be paid when properties are actually acquired, akin to a real estate broker receiving a commission, not when they first take you to look at the houses, not when you make the offer on the houses, not when you sign the contract on the houses, but when you actually close on the property. And each and every investor testified that was their understanding, and it was reflected in the various e-mails and contracts that were circulated. Each and every investor also testified that they did not know the defendant was receiving compensation. They did not know he was taking money. To the contrary, they believed his statements to them that he was working without pay. That's one of the reasons why in 2016, about a year and a half into this venture, the investors provide the defendant with an equity interest in the venture. Now, the agreement had been originally that he would receive a fee when the properties are acquired and closed, but because a year and a half has passed, the defendant is constantly complaining to Mr. Koss and to others that I'm doing all this out of the goodness of my heart without a dime in my pocket. They actually give him an interest in the company, an equity interest to reflect that things haven't closed yet and to give him value for what he was doing. That was the testimony. It was supported, and the jury concluded and credited the testimony of the victims. All the arguments that counsel's making here, in the context of his argument that there's not sufficient evidence, were arguments that were made to the jury. The jury rejected those arguments, and it was rational for them to do so. He lied to the investors. He lied to his bookkeepers to falsely categorize these expenses as business expenses. This was a scheme to defraud from the very beginning when he was tapping into investor funds within a week of the initial investments. Initial investments were made in July 2015. Within two weeks of that, he's making cash withdrawals, domestic cash withdrawals. Within a month of that, he's purchasing jewelry. Within two months of that, he was purchasing his own property here in Chicago. The evidence established this was a scheme to defraud that began right from the beginning and continued all the way to the end. He treated those investor funds, the account that he established for the business that he had exclusive control over, as his personal checking account. He used it whenever he wished to cover his expenses. Over $2 million out of $6 million in investments. That's 33%. The fee was supposed to be per acquisition. There were no acquisitions. He wasn't entitled to a single penny of that money. The jury's finding was rational. It was supported by the evidence. If there are no further questions from the court, the government would ask that you affirm the district court's denial of the defendant's motion for judgment of acquittal. I thank you for your time and attention. Okay, thank you, Mr. Young. Mr. Leonard. Just a couple of points, because my time is brief. Just to correct counsel, I did not say that the three investors that relate to account four, five, and seven never spoke to Mr. Palma. What they testified unequivocally is that those investments had nothing whatsoever to do with Mr. Palma. With regard to the $2 million issue, sounds sexy, sounds like a huge number. It's not true. The undisputed record evidence is that hundreds of thousand dollars went to the Stato, S-T-E-D-O company in Italy. The accountant testified to that. Koss testified to that. All those hundreds of thousands of dollars that are subtracted from the $2 million are monies that went into the properties in Italy, pursuant to the star witness's testimony, Mr. Koss, and pursuant to the testimony of the arm's length witness, the accountant, Mr. Phillips. Thank you. Thank you, Mr. Leonard. And I'm to understand that you took the case by appointment. I did. We want to thank you for taking the case and for your advocacy here today for Mr. Palma. We will take the case under advisement. Thank you. Okay. That adjourns our session today.